UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**CIVIL ACTION NO. 03-621-C**

**RAY MICHAEL ELLIOTTE,**                                                                                  **PLAINTIFF,**

**V.**                                  **MEMORANDUM OPINION AND ORDER**

**UNITED STATES OF AMERICA,**
**DEPARTMENT OF HEALTH AND**
**HUMAN SERVICES,**                                                                                          **DEFENDANT.**

\* \* \* \* \* \* \* \* \* \*

This matter is before the court on the plaintiff's motion to enforce a previous settlement agreement entered in this case (DE 25), as well as his motion for leave to file a supplemental memorandum in support of his motion to enforce (DE 33). Having reviewed the record, including the supplemental memorandum, and being otherwise advised, the court will grant both the motion for leave to file and the motion to enforce the previous settlement agreement.

**I.     BACKGROUND**

The relevant facts are not in dispute. Ray Elliotte, the plaintiff in this case, has been a practicing dentist in Louisville since 1990. Between 1984 and 1987, Elliotte took out four Health Education Assistance Loans ("HEAL loans"),[1] for

---

[1] The HEAL loan "program is a program of Federal insurance of educational loans to graduate students in the fields of medicine, osteopathic medicine, dentistry, veterinary medicine, optometry, podiatric medicine, pharmacy, public health, chiropractic, health administration and clinical psychology." 42 C.F.R. § 60.1(a).

amounts ranging from $13,908 to $18,000.  In 1991, the holder of the third and fourth HEAL loan notes, the Student Loan Marketing Association, filed suit against Elliotte in Kentucky state court, and on February 10, 1993, an agreed judgment in this state court suit was entered against Elliotte for the sum of $47,004.10, plus interest.  (DE 28-5 at 1.)  In 1992, the United States filed a federal lawsuit against Elliotte to collect the amount due under Elliotte's first two HEAL loans, and on July 20, 1992, an agreed judgment was entered against Elliotte in this initial federal suit for the sum of $80,240.27, plus interest.  (DE 25-2 at 2, DE 28-1 at 1.)  On August 12, 1992, the United States filed a judgment lien against Elliotte based on this agreed judgment.

On August 8, 1997, Elliotte filed for Chapter 13 bankruptcy, and he received his discharge from bankruptcy on April 28, 2003.  While Elliotte was in bankruptcy, the United States filed a proof of claim against him arising from the judgment lien based on the 1992 agreed judgment.

In September 2003, Elliotte filed this suit in Kentucky state court, demanding

---

The United States insures each HEAL "lender or holder for the losses of principal and interest it may incur in the event that a borrower dies; becomes totally and permanently disabled; files for bankruptcy . . . or defaults on his or her loan." 42 C.F.R. § 60.1(c).  In the event of such a loss, so long as "the lender or holder has complied with all HEAL statutes and regulations, and with the lender's or holder's insurance contract, and the Secretary pays the amount of loss to the lender or holder, the borrower's loan is then assigned" to the United States.  *Id.* "Only at that time, the United States Government becomes the borrower's direct creditor and will actively pursue the borrower" to collect on the debt, "including reporting the borrower's default . . . to consumer credit reporting agencies or to the Internal Revenue Service . . . for income tax refund offset, and referral to the Department of Justice for litigation."  *Id.*

that the judgment lien against him be released, and the United States removed the suit to this court. On May 12, 2005, while the suit was pending, the United States' Department of Health and Human Services ("HHS") sent Elliotte a letter informing him that he was "indebted to the United States government" and that his account, referring to claim number 750032492, was "seriously delinquent." (DE 28-9 at 1.) This letter also informed Elliotte that the United States intended "to refer this debt to other federal agencies for the purpose of administrative offset under the Debt Collection Improvement Act of 1996," which might include "federal tax refund offset, salary offset, wage garnishment and other federal agencies' payments." *Id.* As the United States' pleadings have since made clear, this letter from HHS referred to Elliotte's debt on his *third* and *fourth* HEAL loans, which were the subject of the state court suit from 1991-93, rather than his *first* and *second* HEAL loans, which were the subject of the initial federal suit in 1992. *See, e.g.*, DE 28-1 at 3 (stating that "HHS sent Dr. Elliotte a notice of intention to offset and refer the debt for the 1986 and 1987 HEAL Loans to other federal agencies on May 12, 2005"). As will be discussed below, however, it appears that Elliotte did not realize that this May 12, 2005 letter referred to his *third* and *fourth* HEAL loans until very recently.

Despite this letter and the confusion it may have generated, the parties conducted a settlement conference on May 27, 2005. On June 6, 2005, the court entered an order dismissing this suit with prejudice and setting forth the terms of

3

the parties' settlement agreement (DE 23).  According to the terms of this settlement, Elliotte agreed to pay $45,000 to the United States by August 25, 2005, and the United States agreed to release its judgment lien and to file a Notice of Satisfaction in the original federal suit that began in 1992.[2]  The settlement also provided that these terms "resolve[ ] all claims made, *or which could be made, in this litigation* . . . ."  (DE 23 at 1 (emphasis added).)

On May 11, 2006, the Student Loan Marketing Association assigned its 1993 judgment from the state court suit against Elliotte, then worth $47,325.93 including interest and court fees, to the United States.  *See* DE 28-10.  On September 29, 2006, the United States' Department of the Treasury sent Elliotte and his wife a letter informing them that the Treasury had forwarded a check to HHS from the Internal Revenue Service worth $7,682.72, which was originally intended for Elliotte and his wife, in order to satisfy an unspecified debt of Elliotte's to HHS.  According to this letter, HHS had previously sent its own letter to Elliotte, which allegedly "explained the amount and type of debt you owe, the rights available to you, and that the Agency [HHS] intended to collect the debt by intercepting any Federal payments made to you, including tax refunds."  (DE 25-4 at 1.)

On April 12, 2007, Elliotte filed the motion presently before the court, seeking an order directing the United States to pay him $7,682.72 and enjoining

---

[2] According to Elliotte, although the judgment lien has been released the United States has not filed a Notice of Satisfaction in the original federal suit.

4

the United States from intercepting or otherwise taking his funds in the future.  In this motion and in affidavits attached to this motion, Elliotte and his counsel alleged that Elliotte did "not know the origin of the purported 'debt' referenced in the September 29, 2006 letter[,]" that Elliotte had not received a previous notice from HHS explaining the amount and type of his remaining debt, and that both Elliotte and his counsel had unsuccessfully attempted to contact HHS to determine the source of this allegedly remaining debt.  (DE 25-2 at 3.)  In its initial response to this motion, the United States indicated that the previous notice was HHS's letter to Elliotte of May 12, 2005, which, however obscurely, referred to the debt arising from Elliotte's *third* and *fourth* HEAL loans rather than the debt arising from Elliotte's *first* and *second* HEAL loans.  *See* DE 28-1 at 3.  In reply, Elliotte confirmed that he had mistakenly assumed the debt referred to in the Treasury letter of September 29, 2006, stemmed "from student loans which were the subject matter of a 1992 federal lawsuit . . . in which the United States was required to file a Notice of Satisfaction under the terms of the June 6, 2005 Settlement Agreement in this case."  (DE 29 at 1.)

    Despite this preliminary confusion, Elliotte continues to argue that he is entitled to the relief requested in his original motion because "the 2005 settlement agreement effects a global settlement of all alleged claims HHS made or could have made against Dr. Elliotte in this lawsuit[,]" including all claims related to the third and fourth HEAL Loans.  (DE 29 at 2.)  Because of the confusion related to the

5

letters of May 12, 2005, and September 29, 2006, the court granted the United States' motion for leave to file a sur-reply. On June 12, 2007, Elliotte filed the motion for leave to file a supplemental memorandum presently before the court (DE 33), which the court will grant.[3] Having reviewed the supplemental memorandum attached to Elliotte's motion for leave to file, the court will address the parties' substantive arguments below.

## II.   ANALYSIS

"'It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them.'" *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (quoting *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988)). Settlement agreements are contracts and are governed by contract law; "[t]hus, 'whether a settlement agreement is a valid contract between the parties is determined by reference to state substantive law governing contracts generally.'" *Bamerilease*, 958 F.2d at 152 (quoting *White Farm Equip. Co. v. Kupcho*, 792 F.2d 526, 629 (5th Cir. 1986)). Under Kentucky law, when no ambiguity exists in a settlement agreement or any other contract, courts "look only as far as the four corners of the document to determine the parties' intentions[,]" and "'[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at

---

[3] The supplemental memorandum is essentially a reply to the United States' sur-reply, which is itself essentially a response to the arguments raised in the plaintiff's original reply, which were necessary because of the plaintiff's underlying confusion about the debt and notice at issue.

variance with its plain and unambiguous terms.'" *3D Enters. Contracting Corp. v. Louisville & Jefferson County Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W. 3d 381, 384 (Ky. Ct. App. 2002)).

According to Elliotte, the United States could have made a claim in this litigation for the debts related to the third and fourth HEAL loans, perhaps as a permissive counterclaim under Federal Rule of Civil Procedure 13(b), prior to the court's entry of the parties' settlement agreement on June 6, 2005. Thus, he concludes that the settlement agreement precludes the United States from asserting such a claim. To support this argument, Elliotte points to HHS's letter of May 12, 2005, which, in light of the United States' present pleadings, was intended to serve as a notice, however unclear at the time, of the United States' intent to collect "the debts which were the subject of the 1991 state case." (DE 29 at 3.) Because the parties' settlement agreement expressly resolved all claims "made, or which could be made, in this litigation," *see* DE 23 at 1, Elliotte concludes that the settlement agreement precludes the United States' present attempt to collect on the debt related to his third and fourth HEAL loans.

In response, the United States claims that although HHS may have been aware of the debt related to Elliotte's third and fourth HEAL loans before the settlement agreement, the existence of these loans and this debt "were not known to the United States Attorney's Office until March 2, 2007," when the loans were

7

referred to the United States Attorney's office for litigation by an unspecified agency, presumably HHS. (DE 32-1 at 2.) Because both the 2006 notice of offset sent by the Department of the Treasury to Elliotte and the March 2007 referral of this matter from HHS to the United States Attorney's office for litigation "were events that postdated the 2005 settlement[,]" and because the third and fourth HEAL loans "were neither referenced by plaintiff nor known to counsel for the United States" at the time of the 2005 settlement, the United States concludes, the settlement agreement does not preclude its present attempt to collect on the debt related to the third and fourth HEAL loans. *Id.* at 3.

Contrary to the United States' suggestion, under the standard announced in *Bamerilease*, *3D Enterprises*, and elsewhere, Elliotte's alleged failure to specifically refer to the debt related to the third and fourth HEAL loans during the 2005 settlement negotiations does not exempt the United States' current claim on this debt from the settlement agreement. Although Elliotte and his counsel appear to have misunderstood the subject of HHS's May 12, 2005 letter, there is no proof that they were unaware of the continuing existence of the debt arising from the third and fourth HEAL loans, nor is there any proof that they were unaware that the United States could have filed a claim against Elliotte for this debt before entry of the settlement agreement in June 2005. Moreover, the United States has shown no reason why this alleged ignorance, even if it existed, should alter the written language of the parties' settlement agreement. The plain language of the written

8

settlement agreement, as entered by this court, supports Elliotte's current claim that it was a "global" settlement resolving all claims made, or which could be made, in this litigation – including the United States' current claim for the debt related to the third and fourth HEAL loans.[4] In bargaining for such a global settlement, Elliotte was not required to recognize all of the claims which the United States could make, nor was he required to disclose such potential claims to the United States' attorneys. Indeed, imposing such requirements would run contrary to the broad and plain language of the written settlement agreement itself.

Similarly, regardless of when HHS alerted the United States Attorney's office of the debt related to Elliotte's third and fourth HEAL loans, its letter to Elliotte of May 12, 2005, reveals that HHS was aware of and intended to collect this debt; indeed, this letter openly contemplates additional legal proceedings beyond the threatened offsets and garnishments. *See* DE 28-9 at 1 (informing Elliotte that he had "the right to present evidence that all or part of [his] debt is not past due or legally enforceable[,]" but that "to exercise these rights, the agency must receive in writing . . . your request of intent and evidence within 60 days from this lettter"). The fact that HHS may not have informed its counsel about its interest in this debt before its counsel entered into a settlement agreement on HHS's behalf does not provide a sufficient reason to alter the plain and unambiguous terms of the written

---

[4] This global relief clause distinguishes this case from *Davis v. Educ. Dep't Servs., Inc.*, 205 F. App'x 711 (11th Cir. 2006), on which the United States presently relies. No such clause is discussed in *Davis*.

settlement agreement, which resolved all of the claims made, or which could be made, in this litigation. Had the agreement resolved only those claims "made, or which could be made (*as presently understood by counsel for both parties*), in this litigation," the matter might be different, but the court sees no reason to undermine the security bargained for by the plaintiff by reading such an additional limiting term into the actual agreement's plain and broad written language.

Thus, the court finds that neither HHS's failure to communicate its intention to collect this debt to its counsel before the settlement, nor Elliotte's and his counsel's alleged confusion about HHS's letter of May 12, 2005, nor Elliotte's failure to specifically refer to this debt in his settlement negotiations with the United States exempts the United States' current claim upon this debt from the settlement agreement. Moreover, the court further finds that the United States could have made a claim upon this debt *in this litigation* before the settlement agreement under Federal Rule of Civil Procedure 13(b), which provides that "[a] pleading *may* state as a counterclaim any claim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim" (emphasis added). Therefore, because the settlement agreement resolved "all claims made, or which could be made, in this litigation," the court concludes that the settlement agreement precludes the United States from raising its claim over this debt now and in the future.

In a final argument, the United States implies that the settlement agreement

does not bar its current claim because, under the "well-defined path toward federal litigation of HEAL loans, as set forth in 42 C.F.R. § 60.1[,]" this claim could not have been made before the settlement agreement. (DE 32-1 at 2.) More specifically, citing § 60.1(c), the United States emphasizes that it becomes the HEAL loan borrower's direct creditor "[o]nly at th[e] time" that it pays the amount of the covered loss to the loan's lender or holder. Thus, the United States suggests that it could not have made its current claim until it paid the amount of the covered loss to the holder of the third and fourth HEAL loans, which occurred after the settlement agreement.

   This argument obscures the fact that by statute, the United States need not wait passively when a borrower such as Elliotte fails to satisfy obligations arising from a HEAL loan. More specifically, according to 42 U.S.C. § 292f(a)(1), when a borrower defaults "on any loan covered by Federal loan insurance . . ., and after a substantial collection effort . . ., the insurance beneficiary shall promptly notify the Secretary and the Secretary shall, if requested . . . by the beneficiary, or *may on his own motion* . . . pay to the beneficiary the amount of the loss sustained" upon that loan by the insured (emphasis added). According to 42 U.S.C. § 292f(b), once the United States has paid "the amount of the loss pursuant to subsection (a) of this section, the United States shall be subrogated for all of the rights of the holder of the obligation upon the insured loan and shall be entitled to an assignment of the note . . . by the insurance beneficiary."

11

The combination of the subrogation rights set forth in § 292f(b) with the use of the permissive term "may" in § 292f(a)(1) shows that the United States could have taken an assignment of the debt from Elliotte's third and fourth HEAL loans and filed its current claim well before the parties' settlement agreement on June 6, 2005.  In fact, the language of the statute shows that the United States could have begun such a course of action on its own motion at any time after the loan holder made a substantial collection effort.[5]  While such a course of action might have departed from the usual path set forth in the regulations, it is nonetheless a course which the United States could have taken before the parties' settlement agreement, and therefore, the court finds that United States' current claim on the debt arising from the third and fourth HEAL loans is precluded by the parties' settlement agreement.  Accordingly,

**IT IS ORDERED** that the plaintiff's motion for injunctive relief and to enforce the previous settlement agreement entered in this case (DE 25) is **GRANTED**.  The United States is hereby enjoined from intercepting or otherwise taking the plaintiff's funds to satisfy claims which could have been made in this litigation before the parties' settlement agreement.  The United States is further directed to disgorge the sum of $7,682.72 to the plaintiff within thirty (30) days of this order.

**IT IS FURTHER ORDERED** that the plaintiff's motion for leave to file a

---

[5] Although the state court litigation over the third and fourth HEAL loans began in 1991, the court need not and will not address precisely when the initial loan holder satisfied this standard for "a substantial collection effort."

supplemental memorandum (DE 33) is **GRANTED**.  The court has reviewed the supplemental memorandum attached to this motion and considered the arguments advanced therein.

Signed on  September 11, 2007

Jennifer B. Coffman, Judge
United States District Court